Dr. S.B. PARDAZI, Plaintiff,

v.

CULLMAN MEDICAL CENTER, Defendant.

No. CV 85–HM–5602–NE.

United States District Court, N.D. Alabama, Northeastern Division.

Dec. 1, 1988.

Horace V. O'Neal, Jr., Birmingham, Ala., for plaintiff.

Stanley A. Cash, Huie, Fernambucq & Stewart, Birmingham, Ala., for defendant.

MEMORANDUM OF DECISION

HALTOM, District Judge.

The above entitled civil action is before the Court upon submitted motion by defendant Cullman Medical Center for summary judgment in its favor with respect to the Title VII, 42 U.S.C. § 2000e *et seq.*, claim for relief of national origin discrimination[1] asserted by plaintiff in his complaint. This Court has previously granted summary judgment in this case in favor of Cullman Medical Center, finding that the relationship between Dr. S.B. Pardazi, an Iran born, naturalized citizen and medical doctor, and the defendant medical center was not one of employment for Title VII purposes. On appeal from that ruling by Dr. Pardazi the Eleventh Circuit Court of Appeals [*Pardazi v. Cullman Medical Center*, 838 F.2d 1155 (11th Cir.1988)] reversed and remanded, finding the reasoning of two cited 9th Circuit decisions to be persuasive in the absence of binding Eleventh Circuit or former Fifth Circuit precedent and holding that the doctor had stated a national origin discrimination claim for relief under Title VII based on his allegation that the medical center's denial of staff privileges interfered with his employment relationship with a third party. This Eleventh Circuit opinion concluded with the following paragraph: *"We reverse the summary judgment and remand. Upon further proceedings, the court, in deciding whether summary judgment is appropriate under Fed.R.Civ.P. 56, should determine whether Pardazi has demonstrated a genuine issue of material fact on the claim that the hospital's actions interfered with his opportunities and privileges under his contract."* This Court now proceeds to make that mandated determination.

1. Dr. Pardazi immigrated to the United States from Iran on February 5, 1972.

## RELEVANT FACTS

Before Dr. Pardazi, a physician duly qualified to practice medicine in the State of Alabama, applied for staff privileges at the Cullman Medical Center located in Cullman, Alabama (Cullman), he entered into an October 15, 1983 written employment contract with Terry D. Neumaster, M.D., P.C., an Alabama professional corporation which conducted a medical practice in Cullman County of which Dr. Terry D. Neumaster, a staff member of Cullman Medical Center, was president. At the time of, or just prior to, the filing of Dr. Pardazi's above referenced application, Dr. Neumaster recommended to the defendant medical center that it be approved. The employment contract, ¶ 1.1 thereof at p. 2, provided in pertinent part: *"This Contract is dependent upon Physician being an active member of the CULLMAN MEDICAL CENTER located in Cullman, Alabama, and having staff privileges; otherwise this Contract shall stand cancelled."* It further provided for a November 1, 1983 Date of Employment (¶ 4.1, p. 9), a Contract Term of two years from Date of Employment with provision that either party could terminate at the end of one year as provided in ¶ 3.2(d) (¶ 4.2, p. 9), Gross Income for Dr. Pardazi of $6,000.00 per month for one year from Date of Employment (¶ 2.1, p. 4), additional compensation for him at end of one year from Date of Employment if employer's actual receipt of income from Dr. Pardazi's gross billings annually exceeded $72,000.00 (¶ 2.9, p. 6), employee personnel for Dr. Pardazi (¶ 2.8, p. 6), vacation time for him and time off for continuing education (¶ 2.2, p. 4), professional liability insurance for him at cost of employer (¶ 2.3, p. 5), payment of any federal, state, county or city license fees by employer (¶ 2.4, p. 5), group health and major medical insurance for Dr. Pardazi (¶ 2.6, p. 5), $500.00 round trip air fare between South Dakota and Birmingham, Alabama for Dr. Pardazi to travel to Cullman to execute the contract (¶ 2.7, pp. 5–6), and costs of Dr. Pardazi moving from South Carolina to Cullman, Alabama, not to exceed $2,500.00 (¶ 2.7, p. 6).

Cullman Medical Center denied Pardazi's application for staff privileges on November 21, 1983. Pardazi requested and received a rehearing.

On rehearing by the defendant medical center, including a "fair hearing" held by Cullman Medical Center on January 7 or 8, 1984, at which Pardazi was personally present, Pardazi's application was approved and he was appointed to the staff of the defendant medical center on March 8, 1984. The appointment was thus delayed for *four months.* However, *it was then granted subject to a twelve-month observation period, a deviation from the Cullman Medical Center medical staff by-laws limiting observation periods to no more than three months.*

The version of what thereafter took place between Dr. Terry Neumaster and Dr. Pardazi with reference to the October 15, 1983 employment contract depends on which deposition is reviewed, that is the deposition of Dr. Neumaster or the depositions of Dr. Pardazi. From the depositions of both such deponents it can be stated therefrom as a relevant undisputed material fact *that the contract in question was never activated.*

According to Dr. Neumaster's deposition, he had decided to move his medical practice to the State of Virginia about the time Dr. Pardazi was granted staff privileges on March 8, 1984 or shortly thereafter, advised Dr. Pardazi of his plans when Pardazi wanted to negotiate another contract, told Pardazi that the employment contract had been cancelled by its terms and provisions since he (Pardazi) did not secure the medical staff privileges from Cullman Medical Center at an appropriate time following the submission of his application, and pointed out to Pardazi that during his period of probation at the Cullman Medical Center he (Pardazi) would be at risk. Dr. Neumaster also testified on deposition that after Dr. Pardazi's application for staff privileges at Cullman Medical Center had been denied he (Neumaster) advised Pardazi that if he planned to practice in Alabama, despite the rejection of his application for staff privileges at Cullman Medical Center, it would

be best for him to go through the appeal process from the Cullman Medical Center denial of his application so that as he later applied to other (medical) facilities for staff privileges he wouldn't have a denial on his record which would make it difficult for him.

Dr. Pardazi was deposed at least twice during the discovery proceedings in this case. His first deposition on file in this court was taken June 22, 1988. His second deposition on file was taken on October 17, 1988. There is some indication that he may have been deposed earlier when he was represented by Attorney Michael J. Evans but no such deposition has been filed. In any event, Dr. Pardazi's deposition testimony on record shows that he does not recall many, if any, of the matters testified to by Dr. Neumaster above set out with the possible exception of Dr. Neumaster's original advice to him recommending the appeal route following the denial of his application for staff privileges at Cullman Medical Center. Dr. Pardazi's deposition testimony strongly suggests that he (Pardazi) made the decision not to activate his employment contract with the Neumaster professional corporation following the March 8, 1984 grant of staff privileges to him by the Cullman Medical Center *because of his distrust of and strong resentment to the one-year observation period conditions attached to that grant.* Pardazi's deposition testimony makes it abundantly clear that he at all relevant times was fully aware of the Cullman Medical Center's regular by-law provision of three months observation customarily and standardly attached to its grant of new staff privileges and that he held a firm belief and conviction that the twelve-month observation condition attached to his staffing privileges was a ploy and a ruse by the Cullman Medical Center to "get at him" sometime during that twelve-month period by "hook or crook" so as to be able to then revoke his staffing privileges for cause. In any event, it is clear from Dr. Pardazi's deposition testimony that he did not push or shove Dr. Neumaster to: [1] activate the October 15, 1983 employment contract in question after he (Pardazi) was finally

granted staffing privileges by Cullman Medical Center on March 8, 1984 with the above referenced twelve-month observation condition; or [2] to negotiate a new contract with him. It is also clear from his deposition testimony that he by deliberate choice never availed or attempted to avail himself of such staffing privileges, never admitted or sought to admit a medical patient to the Cullman Medical Center and, in fact, later requested of the Cullman Medical Center that his staffing privileges be changed to "courtesy staff" which does not require the periodic admission of medical patients to the Center. Cullman Medical Center acceded to such request and Dr. Pardazi to this date presumably retains these courtesy staffing privileges.

Dr. Pardazi testified in his October 17, 1988 deposition that Cullman Medical Center's November, 1983 denial of his application for staff privileges and its later March 8, 1984 grant of staff privileges with attached condition that he was on observation for a twelve-month period was because he was a foreigner (Pardazi Depo. p. 24, lines 15–19, inclusive). He testified that Cullman Medical Center gave him no reason for its November, 1983 denial of his application for staff privileges until his January, 1984 hearing (Pardazi Depo., 10–17–88, p. 10, lines 15–21, inclusive). Dr. Neumaster called him in Birmingham and told him his application was denied; at that time or a bit later Dr. Neumaster told Pardazi that "someone" mentioned "he's a foreigner, we don't want him, it took us two years to get rid of the other foreign doctor, we don't want him now." (Pardazi Depo. 10–17–88, p. 11, lines 15–20, inclusive; p. 13, lines 8–11, inclusive). Pardazi testified: "Dr. Neumaster told me Dr. Papagni came to him and he said, those things have to be stopped. Dr. Peinhardt mentioned he's a foreign doctor, we don't want him now because it took two years to get rid of the other foreign doctor." (Pardazi Depo. 10–17–88, p. 13, lines 14–18, inclusive; p. 14, lines 2–8, inclusive). Pardazi related that Dr. Max, one of the surgeons working at the Cullman Medical Center who helped Dr. Neumaster and the other

surgeons, told him after his application was denied that "they don't want a foreign doctor here and that they talk to you in the front of your face very nice but they hit you from the back" (Pardazi Depo. 10–17–88, p. 14, lines 9–22, inclusive; p. 15, lines 9–12, inclusive). He further testified that Dr. David Hackstadt, head of the Emergency Room Department of Cullman Medical Center, who was head of Dr. Pardazi's hearing committee to hear his appeal from the denial of his application for staff privileges, called him (Pardazi) after the "fair hearing" at his office in Courtland, said he wanted to talk to him and asked him (Pardazi) to come to his (Hackstadt's) office in the Cullman Medical Center. Pardazi related that he went to Cullman and to the emergency room at the Center. At Hackstadt's request the two physicians went to Hackstad's office. Hackstadt then said to Pardazi: "We are going to give you privilege if you resign." This was the first or second week in January, 1984. No one else was present. The conversation was not recorded (Pardazi Depo. 10–17–88; pp. 15–18). Dr. Pardazi also testified concerning a meeting he had with Dr. Papagni in the company of attorneys Victor Miller and Mike Evans. The discussion at this meeting was tape recorded with Dr. Papagni's prior knowledge and consent. Dr. Papagni told them at that time that he remembered Dr. Peinhardt saying with reference to Pardazi: "He's a foreigner and we don't want him, it took us two years to get rid of the other foreign doctors" (Pardazi Depo. 10–17–88, pp. 26–17). Pardazi further testified that he knew of "non-foreign" doctors making application for staff privileges at Cullman Medical Center within the time frame of six months before he applied who were approved by the Center. (Pardazi Depo. 10–17–88, p. 27).

Dr. Pardazi testified in his October 17, 1988 deposition that he lost over $100,-000.00 as a result of the November, 1983 denial by Cullman Medical Center of his application for staff privileges (Pardazi Depo. 10–17–88, p. 29). He related that in addition to the $6,000.00 per month compensation ($72,000.00 annually) he would have received under the October 15, 1983 employment contract with the Neumaster professional corporation had that contract been activated within a reasonable time following the submission of his application to Cullman Medical Center for staffing privileges by the approval of that application he also would have earned additional compensation working at night in the emergency room at the Center (Pardazi Depo. 10–17–88, p. 29, lines 10–15, inclusive). After his application for staffing privileges was denied in November, 1983 he was told by Mr. Pace, the Administrator of Cullman Medical Center, that he (Pardazi) could not work in the emergency room since his application for staffing privileges had been denied (Pardazi Depo. 10–17–88, p. 33, lines 18–19, inclusive). Dr. Pardazi calculated his emergency room "lost earnings" on the basis of $40.00 per hour per 12–hour shift, 10 days per month, amounting to $4,800.00 per month and $57,600.00 per year (Pardazi Depo. 10–17–88, p. 35). He thus calculated his first year lost earnings at $129,600.00 ($72,000.00 contract income plus $57,600.00 emergency room work income).

Dr. Pardazi testified in his October 17, 1988 deposition that he was called by the Courtland, Alabama hospital in Lawrence County, Alabama on December 8, 1983, offered medical employment at that hospital and that he commenced work there in the Courtland Clinic on December 12, 1983 on a day by day employment basis with his compensation set by agreement at $200.00 per day. He explained that he chose to keep his employment at Courtland Hospital on a temporary basis because he had to find out why his privileges were denied in Cullman. He worked at Courtland Hospital under these arrangements during the remainder of the 1983 year and for the January to June period of the 1984 year (Pardazi Depo. 10–17–88, pp. 36–38, inclusive). He made about $20,000.00 or $21,000.00 salary income working at Courtland Hospital without a contract for the first five months of the 1984 year, then signed an employment contract with Courtland Hospital which provided a compensation of $5,000.00 per month (Pardazi Depo. 10–17–88, pp. 38–39). In addition to this salary income he also

earned $1,200.00 to $2,200.00 per month working in the emergency room of the Courtland Hospital (Pardazi Depo. 10–17–88, p. 39). Dr. Pardazi testified that he earned over $100,000.00 in 1985 (Pardazi Depo. 10–17–88, p. 40).

Dr. Pardazi made other applications for staffing privileges at other North Alabama hospitals after his application for staffing privileges at Cullman Medical Center had been denied in November, 1983 and after his application was thereafter approved on March 8, 1984 with the twelve-month observation period condition attached. These other applications were made to: [1] Decatur General Hospital, Decatur, Alabama; [2] Parkway Medical Center, Decatur, Alabama; [3] Moulton Hospital, Moulton, Alabama; and [4] Humana Hospital, Russellville, Alabama. All were approved. The Court here notes that this evidentiary record also shows Dr. Pardazi to be an approved staff member of the Courtland Hospital in Courtland, Alabama as of the middle of December, 1983, about a month following the rejection of his staff privilege application by Cullman Medical Center. Dr. Pardazi testified that he was required to show his prior rejection by Cullman County Medical Center on all such applications but that they were eventually approved with some problem (Pardazi Depo. 10–17–88, p. 47). His later testimony cast some doubt as to the accuracy of his recollection that he had included the Cullman Medical Center rejection in his other staff privilege applications (Pardazi Depo. 10–17–88, p. 48, lines 12–19). Still later Dr. Pardazi flatly testified that his applications for staffing privileges to the other hospitals were submitted *after* Cullman Medical Center on rehearing had granted him staffing privileges with the twelve-month observation condition attached and given that

fact, it was not necessary for him to show a previous rejection in such applications (Pardazi Depo. 10–17–88, pp. 49–50).

The preceding statement of facts has been distilled from the October 17, 1988[2] reconvened deposition of Dr. Pardazi.[2] Pages 5–29, inclusive, of that deposition contain questions posed to deponent by Pardazi's own counsel and his sworn answers thereto. Pages 29–54, inclusive, of the October 17, 1988 deposition contain additional questions posed by counsel of record for Cullman Medical Center ("CMC") and Dr. Pardazi's sworn answers thereto.

\* \* \* \* \* \*

When the deposition of Dr. Pardazi was taken on June 22, 1988[3] by counsel of record for Cullman Medical Center, he resided in Decatur, Alabama and had lived there since February of that year. Prior to that time he lived in a Cullman, Alabama residence except for a four-month period when he had a room at the Cullman Holiday Inn (Pardazi Depo. 6–22–88, pp. 4–5). Pardazi moved his medical offices to Decatur in February, 1988 where he thereafter engaged in a solo family practice, and served on the staff of Decatur General Hospital and Parkway Medical Center both located in that North Alabama municipality. He became a member of the Decatur General staff in the last three months of 1987 (Pardazi Depo. 6–22–88, pp. 7–8, inclusive). He obtained his staffing privileges at Parkway in early 1988. Both Decatur hospitals require members of their staffs to have medical offices in Decatur and to practice there. (Pardazi Depo. 6–22–88, pp. 10–12, inclusive). He also successfully applied for staffing privileges at Lawrence County Hospital in Moulton (Lawrence

---

**2.** Dr. Pardazi was deposed by counsel of record for CMC at their law offices in Birmingham, Alabama on June 22, 1988. This deposition was continued because Dr. Pardazi was called out on an emergency but only after defendant's counsel had completed their initial questioning of deponent. When the Pardazi deposition was reconvened on October 17, 1988 counsel for CMC stated on the record their direct questioning of deponent had been concluded. Pardazi's own

counsel thereupon commenced questioning the deponent.

**3.** The June 22, 1988 deposition of Dr. Pardazi is comprised of 192 pages plus three exhibits (Exhibit No. 1 is the October 15, 1983 employment contract.) However, many of the questions asked by counsel for Cullman Medical Center and sworn answers given by Dr. Pardazi are irrelevant to the issues raised in the within summary judgment proceeding.

County), Alabama in 1988. (Pardazi Depo. 6–22–88, pp. 15–16, inclusive). Additionally, Dr. Pardazi successfully applied for staffing privileges at Humana Hospital in Russellville, Alabama in 1987 (Pardazi Depo. 6–22–88, pp. 16–17, inclusive). He also had staffing privileges at the Courtland, Alabama hospital before filing his applications with the Decatur and Moulton hospitals above referenced. (Pardazi Depo. 6–22–88, pp. 17–18, inclusive).

Dr. Pardazi came to the United States as an immigrant on February 5, 1972. His immigration was motivated by political and educational reasons. He described his political motivation "something was going to happen to the country I was in." His educational motivation was to go for a medical specialty, family practice. He first went to California and began learning the English language. He had his first medical training in the United States in 1978 (Pardazi Depo. 6–22–88, pp. 18–19, inclusive) in Birmingham, Alabama. Prior to this time he obtained employment as assistant medical director at San Antonio, Texas in one of the blood banks. He came to Birmingham in 1978 and completed three years family practice training in 1981 (Pardazi Depo. 6–22–88, pp. 20–21, inclusive). Also in 1981 he secured an endocrinology fellowship at the University of Kentucky in Lexington, Kentucky but completed only one year of that course. He could not complete that course because he was not board certified as an internist (Pardazi Depo. 4–22–88, p. 22). From Lexington, Kentucky he went to Florence, South Carolina where he was employed as a family practitioner in a state mental retardation unit and was temporarily licensed by the State of South Carolina (Pardazi Depo. 6–22–88, pp. 23–24, inclusive). When in Birmingham he went to Florida and took a federal licensure examination known as *FLIEX*. He did not pass although he took that exam two or three times in the State of Florida (Pardazi Depo. 6–22–88, p. 27). Later he transferred all of his grades to Connecticut and obtained his license there, transferred his license to Alabama and obtained an Alabama license (Pardazi Depo. 6–27–88, pp. 28–29, inclusive). At this time he had completed his

post-graduate three years training. From South Carolina Dr. Pardazi moved to Rosebud, South Dakota where he secured public health employment as a family practitioner. He was there around three or four months and then applied to the Cullman Medical Center for staffing privileges (Pardazi Depo. 6–22–88, pp. 31–32, inclusive). At this time his family was living in Birmingham where his wife (Sue Denson of Addison, Alabama) was working. He and his wife decided he should come back to Alabama where he was licensed to practice medicine. He thereupon contacted an Alabama recruiter by name of Hendrick (Pardazi Depo. 6–22–88, pp. 32–33, inclusive), who told him of one physician in Cullman who was looking for a partner. He and Hendrick traveled to Cullman, met with Dr. Neumaster, a CMC staff member, and worked out the agreement which culminated in the October 15, 1983 employment contract. Pardazi places the time as around the second six months of 1983 (Pardazi Depo. 6–22–88, p. 34). Neumaster was looking for another physician to work in his office to see the family or general practice patients since he (Neumaster) was a surgeon. Neumaster told Pardazi he didn't have time to see all his patients. Dr. Pardazi left South Dakota October 28, 1983 after executing the October 15, 1983 employment contract with the Neumaster professional corporation. (Pardazi Depo. 6–22–88, p. 36). By that time Pardazi had passed the *FLIEX* examination (Pardazi Depo. 6–22–88, p. 37). After Pardazi came back to Alabama on October 28, 1983 or shortly before that date he "applied for the privilege" with CMC (Pardazi Depo. 6–22–88, pp. 41–42, inclusive). His children then lived with his wife in Birmingham. Pardazi then moved to Cullman (Pardazi Depo. 6–22–88, p. 44).

Pardazi's first medical employment in the State of Alabama occurred on the night of December 8, 1983 at the emergency room of the Courtland Hospital in Courtland, Alabama. His next practice of medicine in Alabama took place December 12, 1983 in the clinic of the Courtland Hospital in Courtland, Alabama where he commenced

work *on a day by day basis* with no contract (Pardazi Depo. 6–22–88, pp. 44–46, inclusive). He continued to work for the Courtland Hospital until March 5, 1988. After six months of working on a day-by-day basis with Courtland Hospital he went on contract for one year on a salary of $5,000.00 per month. (Pardazi Depo. 6–22–88, pp. 46–47). Dr. Pardazi worked on a daily basis at Courtland the first six months waiting for the CMC "privilege" decision (Pardazi Depo. 6–22–88, p. 48). Pardazi dates his contract with Courtland Hospital as May or June, 1984. He received his CMC staffing privileges with one year observation condition attached on March 8, 1984 (Pardazi Depo. 6–22–88, p. 49). After he filed his application for staffing privileges with CMC Pardazi met with Dr. Rick Gober, CMC chief of staff, in Gober's office for about 10 to 15 minutes, told Dr. Gober he had "applied for the privilege here" and was coming to Cullman to practice medicine. Dr. Gober's response was: "We don't need family practitioner [sic] in this town. There is enough." Pardazi replied that he had talked to a lot of people in Cullman and had been told they were looking for a physician. (Pardazi Depo. 6–22–88, p. 54). Pardazi did not talk to any other CMC related physicians at this time and returned to South Dakota (Pardazi Depo. 6–22–88, p. 54). When he returned to Alabama on October 28, 1983 Pardazi drove to Cullman and talked with the CMC administrator (Oscar Pace) who explained that his CMC application for staffing privileges to go to different departments of the hospital (Pardazi Depo. 6–22–88, pp. 55–56, inclusive). On this trip Pardazi talked to a CMC affiliated pediatrician, Dr. Gonzalez, and one of the CMC radiologists (Pardazi Depo. 6–22–88, p. 56).

Dr. Pardazi recalled that the CMC medical meeting at which his application was considered was held on Tuesday night, November 21, 1983. Dr. Neumaster called him in Birmingham the following day and said: "Your application has been rejected." Pardazi drove to Cullman, met Dr. Neumaster at his office for a few minutes and then contacted the CMC administrator (Pardazi Depo. 6–22–88, p. 58). The next day or two or three days later Pardazi met with Dr. Neumaster again who asked him: "What are you going to do"? Pardazi replied: "I have to find out why" because he recalled the provision in his employment contract which provided he had to have "a privilege in hospital to work." (Pardazi Depo. 6–22–88, pp. 58–59). Later Pardazi met with the CMC administrator at the Cullman Holiday Inn for about two hours. Pardazi told the CMC administrator of his employment contract and the provision requiring that he obtain staffing privileges at CMC (Pardazi Depo. 6–22–88, pp. 61–62). Dr. David Hastek, the CMC emergency room head had scheduled Dr. Pardazi for CMC emergency room work in December. Administrator Pace told Pardazi he couldn't work in the CMC emergency room without staffing privileges. (Pardazi Depo. 6–22–88, pp. 63–64). Pace explained the CMC appeal process available to Pardazi and Pardazi then wrote CMC asking the reason or reasons for the rejection of his application for staff privileges. (Pardazi Depo. 6–22–88, p. 65).

Pardazi discussed his pressing situation with several attorneys before choosing Victor L. Miller. He then requested a CMC hearing (Pardazi Depo. 6–22–88, p. 66).

Dr. Pardazi also discussed his situation with Dr. Terry Neumaster and advised him he (Pardazi) was appealing the CMC denial decision. Pardazi had in mind the staffing privilege requirement of his employment contract. No other details of this discussion appear in the 6–22–88 deposition.

The CMC fairness hearing for Dr. Pardazi was held on January 7 or 8, 1984. A group of doctors chaired by Dr. David Hastek and Dr. Gober were present. The CMC hospital administrator was there. Pardazi described questions which were propounded to him: "Why didn't he have a license"? "Why he jumped from here to there"? "Why he came to Cullman"? "Why he didn't go some place else"? (Pardazi Depo. 6–22–88, p. 69) Pardazi was not permitted to have his attorney present at the CMC hearing although he made such requests. He did not recall whether CMC had its attorney present (Pardazi Depo. 6–22–88,

pp. 82–83). Pardazi tape-recorded the entire CMC hearing proceedings and a CMC employee transcribed it (Pardazi Depo. 6–22–88, pp. 85–87, inclusive).

Dr. Pardazi expressed the opinion that some of the material relied upon by CMC for the rejection of his application actually came in after he had been rejected (Pardazi Depo. 6–22–88, p. 116). He was told that when the CMC Credentials Committee was considering his application in November, 1983 before the negative vote one of the doctors said: "This is a foreign doctor. We don't want him in." (Pardazi Depo. 6–22–88, p. 129). Dr. Neumaster told Pardazi that Dr. Peinhardt said that. He then elaborated on what Dr. Neumaster had said to him: "Dr. Neumaster told me Doctor Gober in their Credential Committee said, *He is a foreign doctor. We don't want him in. It took the Cullman Medical Center two years to get rid of the other foreign doctor.*" Pardazi added that the foreign doctor referred to by Dr. Rick Gober was an Indian doctor who was there for two years and left. (Pardazi Depo. 6–22–88, p. 130). Pardazi later testified that Dr. Neumaster told him that he (Neumaster) had overheard Dr. Gober's remarks. Pardazi stated he had a written statement from Dr. Papagni, a CMC affiliated physician, who told "us" he was in that meeting—"he heard"—"he listened" and that Dr. Peinhardt said: "*He is a foreign doctor and we don't want him*" (Pardazi Depo. 6–22–88, p. 132). Pardazi also related that "they" went to Dr. Papagni's office and recorded his statement (Pardazi Depo. 6–22–88, pp. 133–134, inclusive).

Pardazi also went to the home of Dr. Richard Max, another CMC affiliated physician, and talked to him. Dr. Max told Pardazi that "*they are very prejudiced and don't want a foreign doctor here.*" (Pardazi Depo. 6–22–88, pp. 135–136).

Dr. David Hastek, another CMC affiliated physician whom Pardazi thinks chaired his CMC fairness hearing, called Pardazi at his (Pardazi's) office to come to Cullman to see him. This was after the "fair hearing". Pardazi traveled to Cullman and met with Dr. Hastek in his office.

Dr. Hastek said to Pardazi: "*We are going to give you the privilege but we want you to resign.*" Pardazi stated that his response to Hastek was sharply negative. He further related that Dr. Hastek then told him: "*They don't want you here. I am telling you 'they' don't want you.*" Dr. Pardazi told him: "no deal". (Pardazi Depo. 6–22–88, pp. 140–142).

Pardazi next recounted that by March 8, 1984 "they" approved "my privilege" but "there was some clause there which was unusual." He referred to the one-year observation condition in his privilege and to the CMC standard by-law observation period of three months (Pardazi Depo. 6–22–88, pp. 142–143, inclusive).

After he got his CMC "privilege" Pardazi talked with Dr. Neumaster and recalls that he told Neumaster in effect that he had this CMC "privilege" but that he was not stopping because of the one-year observation condition made just for him and not in conformity with the CMC by-laws. (Pardazi Depo. 6–22–88, pp. 143–144, inclusive).

When asked by counsel for CMC if he (Pardazi) made any arrangements to start working with Dr. Neumaster under the employment contract after he received his CMC "privilege", Pardazi replied: "*I did not accept the privilege with this condition. I didn't want to accept it because that was unusual.*" He was referring to the one-year observation period conditions in the CMC "privilege". Dr. Pardazi did not start admitting patients to CMC nor did he write or otherwise notify CMC that he was not accepting their "privilege". When asked if he was in any way on the CMC staff replied: "*I changed my staff situation to—it was last year I changed it to courtesy staff, I believe.*" (Pardazi Depo. 6–22–88, pp. 147–148, inclusive). He explained that he thought active CMC staff members had to admit patients but that courtesy staff did not to keep the privilege. Pardazi also stated he was still on CMC's courtesy staff (Pardazi Depo. 6–22–88, p. 148).

Dr. Pardazi described his understanding of the CMC observation period condition: "*My understanding was that was another*"

excuse to put me under the pressure based on the previous information I had that Dr. Peinhardt said '[i]t took us two years to get rid of that doctor.' I feel I am going to be in the same situation and that was very unacceptable." (Pardazi Depo. 6–22–88, pp. 148–149, inclusive). He further described the CMC twelve-month observation period condition as "some excuse to kick me out" and that his feeling was "they" would try to revoke his privilege (Pardazi Depo. 6–22–88, pp. 149–150, inclusive). He described the "[h]e is a foreigner. We do not want him in this place" statements by Dr. Peinhardt and Dr. Gober as discrimination. He admitted he told Dr. Neumaster he (Pardazi) was not going to accept CMC staff privileges with the twelve-month observation period condition attached (Pardazi Depo. 6–22–88, pp. 151–152, inclusive). He said he told Neumaster: *"I am not going to accept it. I am going to continue or clear those accusations one by one."* (Pardazi Depo. 6–22–88, p. 152). He added: *"We didn't discuss I am going to work or I am not going to work. I said: 'I am not going to accept this observation with this kind of condition with all of those accusation [sic] and I have to go a different route.'"* (Pardazi Depo. 6–22–88, p. 153). Pardazi told Neumaster that his route was "going through the legal way" (Pardazi Depo. 6–22–88, p. 153). Upon direct inquiry by CMC's counsel of record Dr. Pardazi did not recall any conversations with Dr. Neumaster concerning his employment contract with Neumaster's professional corporation (Pardazi Depo. 6–22–88, p. 154).

After considerable sparring with CMC counsel of record, Dr. Pardazi testified he advised Dr. Neumaster that he (Pardazi) was not going to accept the one-year (observation) period condition and that it was his decision not to go to work with Neumaster because of the one-year observation period (Pardazi Depo. 6–22–88, pp. 157–158, inclusive). Dr. Pardazi further testified: *"after the rejection, after the condition, most of the conversation was based on this turmoil situation. I believe the contract still was good, was exist [sic]."* (Pardazi Depo. 6–22–88, p. 159). He was asked:

"So you felt at any time you were willing to accept the one year observation period that you could go to work with Dr. Neumaster"? and replied: "I believe so." (Pardazi Depo. 6–22–88, p. 160). Dr. Pardazi professed to be unaware of when Dr. Neumaster left Cullman but he was aware that Neumaster was no longer in Cullman (Pardazi Depo. 6–22–88, p. 160).

The remainder of the 6–22–88 deposition of Dr. Pardazi furnishes no relevant testimony concerning the issues in this summary judgment proceeding.

\* \* \* \* \* \*

The Deposition of Dr. Terry Neumaster, M.D., taken on October 21, 1988, was filed in the Huntsville Office of the Clerk of Court on the 23rd day of November, 1988 after the Court had completed its statement of relevant facts in this summary judgment proceeding. Since certain [purported] relevant parts of Dr. Neumaster's deposition [pages 10, 25, 16 and 27] were submitted to the Court at the time of submission of *Plaintiff's Response and Memorandum Brief In Opposition To Defendants' Motion For Summary Judgment* filed herein on November 1, 1988 and have been carefully reviewed, the Court, after reviewing the Neumaster deposition in its entirety, concludes that all material relevant facts appearing in Dr. Neumaster's deposition have been [essentially] previously stated in the within Memorandum of Decision.

## DISCUSSION

The defendant hospital has now moved for summary judgment (second summary judgment motion) on two grounds:

[1] Pardazi has not demonstrated a "genuine issue of material fact" on the claim of Dr. Pardazi that the Cullman Medical Center's actions taken in response to his application for staff privileges interfered with his opportunities and privileges under his October 15, 1983 Contract of Employment.

[2] Pardazi action is barred by provisions of 42 U.S.C. 2000e–5(f)(1) because he did not file his complaint in this action within

the requisite 90 day period from and following his receipt of EEOC Right–To–Sue Letter *with an intent to obtain immediate service of process on defendant.*

### Interference Issue

Essentially the defendant here contends that this summary judgment evidentiary record shows its November, 1983 decision denying Dr. Pardazi's application for staff privileges did not interfere with Dr. Pardazi's opportunities and privileges under his October 15, 1983 Contract of Employment for two reasons: [1] Cullman Medical Center accorded Dr. Pardazi a rehearing and a fairness hearing and on March 8, 1984 granted Dr. Pardazi staff privileges with reasonable condition attached that he be under observation for twelve months. Therefore, asserts defendant, after only a four-month delay, Dr. Pardazi was free to practice medicine in accordance with his October 15, 1983 Contract of Employment with the Neumaster professional corporation; and [2] By Dr. Pardazi's own testimony he did not want to fulfill his employment contract with the Neumaster professional corporation because of the twelve-month observation period condition and voluntarily and unreasonably elected not to work under that contract because of his feelings that Cullman Medical Center would "run him off" during the observation period. Otherwise stated, it is defendant's position that this summary judgment evidentiary record shows that Dr. Pardazi himself elected not to fulfill his third party employment contract because he was afraid that sometime *in the future* Cullman Medical Center would try to "run him off."

\* \* \* \* \* \*

In ruling on defendant's motion for summary judgment this Court must consider all evidence in light most favorable to the non-moving party. *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). But as the Supreme Court noted, this does not lessen the burden of the non-moving party in any way. The non-moving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In addition, a court ruling on a summary judgment motion must evaluate the evidence in light of the proper standard of proof. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). See also *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

\* \* \* \* \* \*

■ Given the relevant undisputed material fact that the October 15, 1983 Contract of Employment between the Neumaster professional corporation and Dr. Pardazi plainly provides in ¶ 1.1 thereof: *"This Contract is dependent upon Physician being an active member of the CULLMAN MEDICAL CENTER . . . and having staff privileges; otherwise this Contract shall stand cancelled,"* given the relevant undisputed material fact that in November, 1983 Cullman Medical Center denied Dr. Pardazi's application for staff privileges, and given the relevant undisputed material fact that this denial of staff privileges was in force and effect for approximately four months, it appears clear and certain at this juncture of the case that Dr. Pardazi has come forward with sufficient, admissible evidence raising a genuine issue of material fact on the issue of whether the Cullman Medical Center's November, 1983 denial of staff privileges, standing alone, ipso facto worked a cancellation of the employment contract in question. If, on the other hand, it is to be argued that it is a question of law for the Court to decide and determine from these three relevant undisputed material facts above referenced, standing side by side, the Court's ruling would be that since the employment contract in question is silent on the time permitted within which Dr. Pardazi had to secure such staff privileges the Court would receive additional evidence on that factual issue, i.e., what was within the contemplation of the parties? And if satisfactory additional evidence on that factual issue was not forthcoming or not available for whatever reason, the Court would rule, first, that Dr.

Pardazi by law had a reasonable period of time from and following the execution of such contract on October 15, 1983 within which to secure the requisite staff privileges, second, that 60 or possibly 90 days from execution date would by law be a reasonable period of time and finally, that by law and fact the contract stood cancelled by its own provisions chosen by the parties when Dr. Pardazi was unable to secure the requisite staffing privileges within that period of time.

■ Of course, defendant understandably argues that after only a four-month delay the denial decision in question was reversed and that Dr. Pardazi was then granted staff privileges at Cullman Medical Center with condition attached that he be under observation for a twelve-month period. This action, asserts defendant, left Dr. Pardazi free to commence his employment with the Neumaster professional corporation under the October 15, 1983 Contract of Employment. This particular argument is necessarily premised on the questionable proposition that on March 8, 1984 there was *then* a viable in-force Contract of Employment under which Dr. Pardazi could commence work. If defendant could leap over this legal hurdle, which is questionable, Dr. Pardazi has come forth in this summary judgment procedure with admissible evidence regarding the Cullman Medical Center's standard by-law provision providing that the observation period condition attached to staff privilege grants was not to exceed three months, thus raising the interesting issue of whether the twelve-month observation period condition attached to the grant of Dr. Pardazi's staff privileges was unreasonable and intolerable under the existing circumstances such that a reasonable physician would have felt compelled to reject staffing privileges at Cullman Medical Center with that condition attached. While it is somewhat difficult to place this type of evidence into the proper

legal niche in this Title VII litigation, the Court concludes that such evidence is admissible and pertinent for the Court's consideration on the issue of whether the March 8, 1984 ostensible grant of staff privileges under the circumstances can be treated and considered as valid. Moreover, Dr. Pardazi has also come forward in this summary judgment proceeding with additional evidence in the form of testimony from Dr. Terry Neumaster to the effect that by March 8, 1984 (date of privilege grant with condition) he was unwilling to treat the October 15, 1983 Contract of Employment .as being in force and effect and further that by that time he was considering a move to Virginia and was unwilling to negotiate a new contract with Dr. Pardazi.

For the foregoing reasons, the Court concludes and holds that the defendant CMC is not entitled to summary judgment in the above entitled civil action on the asserted ground that Pardazi has not demonstrated a genuine issue of material fact on his claim that CMC's actions interfered with his opportunities and privileges under his October 15, 1983 Contract of Employment and that CMC is therefore entitled to judgment as a matter of law.[4]

Was this Title VII action *"commenced"* within the 90–day period after Dr. Pardazi received his right-to-sue letter from EEOC?

The above entitled Title VII civil action by plaintiff Dr. S.B. Pardazi against the defendant Cullman Medical Center charging discrimination on the basis of national origin was filed in this Court on September 12, 1985 with Attorney Michael J. Evans as plaintiff's attorney of record. On June 14, 1984, Dr. Pardazi through the same attorney had filed in this Court and in this Northeastern Division a 42 U.S.C. § 1983 civil action against the same defendant based upon the same alleged discriminatory acts alleged in the present action. This

---

**4.** If the Court were not granting the defendant's motion for summary judgment on the 42 U.S.C. § 2000e–5(f)(1) ground asserted (ante, p. 861), the Court would be strongly tempted to sua sponte hold that Dr. Pardazi was entitled to summary judgment on the Title VII liability issue and then proceed with final bench hearing on the issue of the proper damages to be awarded, plus other relief in the form of an award of reasonable attorney's fees to plaintiff's counsel and costs.

1984 case was docketed as CV 84–H–5436–NE.

On May 7, 1984 Dr. Pardazi filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) based upon the same alleged discriminatory acts alleged in the 1984 case and in this case. When Dr. Pardazi received his right-to-sue letter from EEOC "in 1985",[5] he thereafter filed this Title VII action although his § 1983 case above referenced was still pending. While this record does not show the date on which Dr. Pardazi received his right-to-sue letter, the Court has assumed that the present Title VII action was filed within 90 days thereafter since no argument has been made to the contrary. The Affidavit of Attorney Michael J. Evans filed herein on March 14, 1986 provides the subsequent alleged sequence of events upon which defendant's second ground asserted in support of its motion for summary judgment is based:

> This case arose out of the original denial of the Plaintiff's application for staff privileges at the Defendant Cullman Medical Center, and the subsequent decision on appeal that the Cullman Medical Center would give Plaintiff staff privileges with a one year observation period, instead of a four (4) month period as provided in the Medical Center By–Laws. Plaintiff is a native of Iran. On May 7, 1984 Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission. On June 14, 1984, I filed a lawsuit for the Plaintiff against the Defendant Cullman Medical Center seeking recovery under 42 USC Section 1983. That suit was filed in the U.S. District Court for the Northern District of Alabama, Northeastern Division, and bears the case number CV84–H–5436–NE.

> When the Plaintiff received his notice of right to sue from the Equal Employment Opportunity Commission in 1985, I filed this action. At that time, settlement negotiations were going on with the defendant Cullman Medical Center in the other case. I informed defense counsel for the defendant of the fact that I had filed this case, and asked defense counsel if he would accept service. He said that he would check with his client and let me know whether he could accept service. At that time, we had an understanding that any settlement of the plaintiff's claim in the other case would also dispose of this case as well. During the 120 day period after the suit was filed, I believed that we would either accomplish a settlement of both cases or go to trial on the case brought under 42 USC Section 1983. I believed that a judgment in the case brought under 42 USC Section 1983 would result in a judgment which would likely bar any Judgment in this case on the grounds of res judicata.

> Discovery was completed in the case brought pursuant to 42 USC Section 1983 on February 20, 1986. The discovery disclosed that the Cullman Medical Center was not a county owned hospital, and research done after completion of discovery indicated to me that we would not be able to prove state action so as to prevail on the claim brought under 42 USC Section 1983. On March 4, 1986, I moved the court to dismiss case number CV84–H–5436–NE without prejudice, and the court dismissed the case without prejudice. If the court will permit the plaintiff to have a seven (7) day period in which to serve the summons and complaint, plaintiff's Counsel will see to it that service is accomplished within that time.

Under date of March 4, 1986 (date of dismissal of CV84–H–5436–NW by Judge James H. Hancock pursuant to plaintiff's motion) the record in the present case revealing that service of process had not been effected upon the defendant Cullman Medical Center during the approximate 6–month period following the September 12, 1985 filing date, the Court issued order pursuant to Rule 4(j), Fed.R.Civ.P., directing that plaintiff Pardazi show cause in writing and under oath within 10 days from date of order why defendant had not been served within 120 days of the filing of the

---

5. Affidavit of Attorney Michael J. Evans filed    March 14, 1986, p. 1.

complaint, failing which the case would be dismissed without prejudice. In response thereto plaintiff submitted the Affidavit of his counsel of record hereinabove referenced. On March 20, 1986 the Court entered the following Order:

In response to Order of the Court entered in the above entitled civil action on March 4, 1986 pursuant to Rule 4(j), Fed. R.Civ.P., requiring plaintiff to show good cause in writing and under oath to this Court within 10 days from the date of such order why service of the summons and complaint herein had not been made upon defendant within 120 days of the filing of the complaint in this case, plaintiffs' counsel of record, Michael J. Evans, submitted his affidavit under oath on March 14, 1986 stating the facts relied upon by him for not causing the summons and complaint to be served upon defendant from September 12, 1985 to this date, a period of approximately 157 days.

While the facts stated in Mr. Evans' affidavit do not constitute an adequate showing of good cause within the intendment of Rule 4(j), Fed.R.Civ.P., at least in the opinion of the Court, the Court *is* concerned as to the effect of a dismissal even without prejudice on plaintiff's asserted Title VII claim for relief in this action and will therefore exercise its discretion and keep this case on the docket. Plaintiff is GRANTED seven (7) days from this date to effect service upon defendant, failing which this action will be promptly dismissed. It is so ORDERED and ADJUDGED.

Service of process was thereafter effected upon defendant Cullman Medical Center on March 27, 1986, approximately 195 days from and following the September 12, 1985 filing of the complaint herein.

On April 15, 1986 defendant filed 12(b)(6) motion to dismiss herein which was overruled on April 18, 1986, with 20 days to answer. Defendant's answer to the complaint in this case was filed on May 23, 1986 which alleges in part as follows:

3. Defendant affirmatively alleges that the Court lacks jurisdiction of the subject matter of the Plaintiff's Complaint by reason of the Plaintiff's failure to file suit within the period allowed after proper notice from the Equal Employment Opportunity Commission in accordance with 706(f)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(1).

4. Defendant alleges that the Plaintiff's Complaint is barred by the applicable statute of limitations.

5. Defendant affirmatively alleges that the Plaintiff failed to file charge with the Equal Employment Opportunity Commission within 180 days of the alleged discrimination.

8. This Court lacks jurisdiction over the subject of this lawsuit and lacks in personam jurisdiction over this Defendant.

Under date of June 13, 1986 Attorneys Victor L. Miller and Horace V. O'Neal, Jr. entered their appearances as co-counsel for plaintiff, alleging that Attorney Michael J. Evans was in the process of withdrawing his representation of Dr. Pardazi. On June 16, 1986 Attorney Michael J. Evans filed motion to withdraw which was granted by order entered on June 18, 1986.

On June 18, 1986 the Court also entered Order in this case vacating its April 18, 1986 Order overruling the defendant's April 15, 1986 12(b)(6) motion and converting it into one for summary judgment to be disposed of as provided in Rule 56, Fed.R. Civ.P., because of the presentment of matters outside the pleadings and not excluded by the Court. That Order further provided a summary judgment submission date of June 30, 1986 and all parties were thereafter given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. On January 27, 1987 the Court granted defendant's motion for summary judgment, finding and holding that the relationship between Dr. Pardazi and Cullman Medical Center was not one of employment for Title VII purposes, and thereupon entered final judgment in favor of defendant. Pardazi thereafter appealed on February 4, 1987. As heretofore noted, the Eleventh Circuit Court of Appeals on February 29, 1988 reversed and remanded,

838 F.2d 1155. At page 1155 of 838 F.2d the Eleventh Circuit stated:

Dr. S.B. Pardazi, an Iran-educated medical practitioner, appeals a summary judgment for the defendant hospital. *The trial court held that because Dr. Pardazi was not an employee of the hospital, it was unnecessary to reach other questions presented in this Title VII action for damages and other relief arising out of a claim of national origins discrimination.* We reverse and remand. (Emphasis supplied).

Status conference in this case was set and scheduled on May 6, 1988 by Order entered herein on March 28, 1988. By reason of the prolonged illness of the undersigned judge and his consequent absence from duty from April 9, 1988 to July 11, 1988, the status conference scheduled for May 6, 1988 was continued and later held on August 26, 1988.

On August 17, 1988 defendant Cullman Medical Center filed its second motion for summary judgment in the above entitled civil action, asserting, inter alia, the failure of Dr. Pardazi to commence the present action within the 90–day period following his receipt of the EEOC right-to-sue letter as prescribed by 42 U.S.C. § 2000e–5(f)(1) and submitting argument in support thereof that the mere filing of the complaint herein within the 90–day period did not stop the running of the statute since plaintiff admittedly made no effort whatever in this case to effect service of process upon it for approximately six (6) months after the action was commenced despite the Clerk's compliance with Rule 4(a), Fed.R. Civ.P., and the plain mandate of that rule which provides: *"upon the filing of the complaint the clerk shall forthwith issue a summons and deliver the summons to the plaintiff or the plaintiff's attorney, who shall be responsible for prompt service of the summons and a copy of the complaint."* The Court here reiterates that Cullman Medical Center was not served in this case until March 27, 1986, approximately 185 days from the date this Title VII action was instituted.

The Court here notes that the defendant Cullman Medical Center has from the outset of its appearance herein clearly and consistently maintained that this action was time barred by the provisions of 42 U.S.C. § 2000e–5(f)(1), as that section should be construed in light of plaintiff's deliberate conduct in not effecting service of process on the Title VII defendant [12(b)(6) motion to dismiss filed April 15, 1986; Answer filed May 23, 1986; First Motion For Summary Judgment; Brief In Support of (First) Motion For Summary Judgment, Sec. 3, p. 5, filed June 27, 1986; Second Motion For Summary Judgment; Brief In Support of (Second) Motion For Summary Judgment, Sec. 2, pp. 4–8, inclusive, filed October 31, 1988].

Rule 3, Fed.R.Civ.P., provides: *"A civil action is commenced by filing a complaint with the court."* While plaintiff's former counsel of record took this first step for plaintiff in this action he neglected to do what was thereafter "forthwith" mandated by Rule 4(a), Fed.R.Civ.P.

Note 4 of the Notes of Advisory Committee on Rules under Rule 3 reads:

4. This rule provides that the first step in an action is the filing of the complaint. Under Rule 4(a) this is to be followed forthwith by issuance of a summons and its delivery to an officer for service. Other rules providing for dismissal for failure to prosecute suggest a method available to attack unreasonable delay in prosecuting an action after it has been commenced. When a federal or state statute of limitations is pleaded as a defense, a question may arise under this rule whether the mere filing of the complaint stops the tolling of the statute, or whether any further step is required, such as, service of the summons and complaint or their delivery to the marshal for service. The answer to this question may depend on whether it is competent for the Supreme Court, exercising the power to make rules of procedure without affecting substantive rights, to vary the operation of statutes of limitations. The requirement of Rule 4(a) that the clerk shall forthwith issue the summons and deliver it to the mar-

shal for service will reduce the chances of such a question arising.

It is obvious that the *requirement* of Rule 4(a) referred to by the Advisory Committee did not prevent the "question" from arising in this case because plaintiff's former counsel of record clearly and simply ignored it. Although the Affidavit of Attorney Michael J. Evans (former attorney of record for plaintiff) filed herein on March 14, 1986 states in pertinent part:

> When the Plaintiff received his notice of right to sue from the Equal Employment Opportunity Commission in 1985, I filed this action. At that time, settlement negotiations were going on with the defendant Cullman Medical Center in the other case. I informed defense counsel for the defendant of the fact that I had filed this case, and asked defense counsel if he would accept service. He said that he would check with his client and let me know whether he could accept service. At that time, we had an understanding that any settlement of the plaintiff's claim in the other case would also dispose of this case as well. During the 120 day period after the suit was filed, I believed that we would either accomplish a settlement of both cases or go to trial on the case brought under 42 USC Section 1983. I believed that a judgment in the case brought under 42 USC Section 1983 would result in a judgment which would likely bar any Judgment [sic] in this case on the grounds of res judicata.

it is the considered opinion and holding of the Court, even assuming the factual matters above quoted to be factually accurate,[6] that counsel of record for these parties had no right to vary the operation of the 42 U.S.C. § 2000e–5(f)(1) statute of limitations in the manner now suggested by *present* counsel for plaintiff in their most recent brief. While mindful of the doctrine of equitable tolling, this Court is also mindful of the observation of the United States Supreme Court in *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (cited by counsel of record for defendant), that it found no satisfactory basis for giving Title VII actions a special status under the Federal Rules of Civil Procedure and of its ruling in that case that the respondent there forfeited her right to pursue her claim under Title VII of the Civil Rights Act of 1964 because of her failure to file a proper complaint[7] within 90 days of her receipt of the right-to-sue letter, as required by the Act. Said the Court: "Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded out of a vague sympathy for particular litigants." 466 U.S. at 152, 104 S.Ct. at 1726.

Neither the United States Supreme Court decision in *West v. Conrail*, 481 U.S. 35, 107 S.Ct. 1538, 95 L.Ed.2d 32 (1987), or the decision of the Eleventh Circuit Court of Appeals in *American Postal Workers Union v. U.S. Postal Service*, 823 F.2d 466 (11th Cir.1987), dictates a holding here that the 90–day provision in 42 U.S.C. § 2000e–5(f)(1) was equitably tolled by the factual matters alluded to in the Affidavit of Michael J. Evans, former counsel of record for plaintiff, or a holding that the Order of this Court entered herein on March 20, 1986 [following the show cause response of plaintiff] which granted plaintiff seven (7) days within which to effect service upon defendant constituted a court ruling in favor of plaintiff on the Title VII

---

**6.** While this summary judgment evidentiary record shows no evidence in conflict with the "facts" related by plaintiff's former counsel of record, some of these so-called "facts" related by Mr. Evans are highly questionable from a standpoint of competency as evidence. Moreover, his *alleged* reliance on the factual situation he describes was highly questionable, in fact unreasonable and completely without legal support. The plaintiff must bear the consequences of the unfortunate result caused by the acts and omissions of his own counsel.

**7.** Brown mailed her right-to-sue letter (and nothing else) to the United States District Court and requested appointment of counsel. The legal issue was whether the filing of the right-to-sue letter with the court constituted commencement of an action within the meaning of Rule 3 of the Federal Rules of Civil Procedure. Stressing that the remedial nature of the statute required its liberal interpretation the Court of Appeals held that the filing of the right-to-sue letter "tolled" the time period provided by Title VII.

statute of limitations issue and therefore precludes this Court from granting defendant's motion for summary judgment on that issue.

In *West v. Conrail,* a unanimous Supreme Court held that when the six month period of § 10(b) of the NLRA is borrowed for a *Del Costello* type action, the borrowing does not include the provision in that subsection requiring that "service of a copy thereof upon the person against whom said charge is made" also be effected within the six-month period. Accordingly, the Court held that the action was timely when "commenced" within the meaning of Fed.R. Civ.P. 3, i.e., the complaint was filed, within the limitations period so long as proper service was effected within 120 days as provided in Fed.R.Civ.P. 4(j).

In *American Postal Workers Union v. U.S. Postal Service* the plaintiff American Postal Workers Union brought suit in two cases to vacate arbitration awards rendered pursuant to a collective bargaining agreement with the United States Postal Service. The district court dismissed the complaints, holding them both untimely and the union appealed. The Eleventh Circuit reversed and remanded holding that: (1) three-month limitation period of the Federal Arbitration Act applied to the actions; and (2) the union was not required to effect proper service within the three-month statute of limitations period. The Eleventh Circuit cited the Supreme Court holding of *West v. Conrail* as dictating the analysis in the case before it, stating:

> Specifically, the requirement of the USAA that notice of a motion to vacate be "served" within three months is not part of the borrowing. Whatever our doubts about adding an additional four months onto a three-month (or even six-month) limitations period specifically chosen for its brevity, that decision is no longer ours to make. Therefore, if the plaintiff filed its complaint to "commence" the action within three months (which it did), (footnote omitted) and effected proper service within 120 days of filing (which it did), (footnote omitted) then the actions are timely.

Wright & Miller, Federal Practice and Procedure: Civil 2nd § 1056 (2nd Ed.1987) extensively discusses the relationship between Rule 3, Fed.R.Civ.P., and tolling of the statute of limitations, stating at the outset that it has always been a matter of controversy:

> Does the mere filing of the complaint toll the statute, or must further steps, such as service of the summons and complaint or their delivery to the server or the party to be served, be completed within a specified period of time? Although the original Advisory Committee identified this problem, it did not answer it, placing its faith in Rule 4(a)'s command that a summons be issued "forthwith" to avoid controversies over the timing of service of process. (footnote omitted) § 1056, pp. 177–178, inclusive.

In cases based upon federal question jurisdiction, if there are relevant statutory provisions indicating what steps must be taken in order to toll the statute of limitations, they are controlling and the application of Rule 3 is not involved. However, if the federal statute is silent as to when the statute of limitations is tolled, then the absence of a statutory standard, and the desire to maintain uniformity of procedure, would make the test for commencement in Rule 3 applicable. (footnote omitted) The cases suggest that when the right asserted is created by federal law, state law regarding commencement is inapplicable for tolling purposes. (footnote omitted) In diversity cases, however, state law governs the tolling of the statute of limitations under the doctrine of *Erie Railroad Company v. Tompkins* and its progeny. (footnote omitted)

Since the federal rules were silent on the statute-of-limitations question, and state law was inapplicable, federal courts were left to their own initiative to decide what was required to toll the statute of limitations in federal question cases when no relevant federal statute included a special tolling provision. (footnote omitted) Federal courts were divided as to what standard to apply for tolling the statute of limitations, and even those

that agreed upon a standard applied it differently. This discretion on the part of the federal courts has been largely curtailed by the 1983 amendments to Rule 4, which set out a specific requirement that service of a summons and complaint be completed within 120 days of the filing of the complaint. § 1056, pp. 178–181, inclusive.

[T]he flexible standard of due diligence has been replaced by the specific time limit of Rule 4(j), also added by Congress in 1983. (footnote omitted) Under the new Rule 4, read in conjunction with Rule 3, the filing of the complaint commences a federal question case for statute of limitations purposes, but only provisionally. Similarly, a case arising under a federal statute with its own tolling provision can toll the statute only temporarily. Suits commenced in accordance with Rule 3 or a federal statute still risk dismissal if process is not served within 120 days of filing and good cause is not shown. Such a dismissal leaves plaintiff in the same position as if the action never had been commenced, (footnote omitted) and it is possible that the statute of limitations will have expired between the original commencement and the dismissal. (footnote omitted) It seems probable, however, that a showing of due diligence under the old standard will be enough for a good cause extension under Rule 4(j), which will keep the statute of limitations tolled. Thus, the 120–day limit is the equivalent of a congressional codification of the formerly fluid due-diligence standard. Judicial discretion will continue in the context of deciding what constitutes "good cause," but the initial presumption has been set that service within 120 days equals due diligence. (footnote omitted) § 1056, pp. 187–188, inclusive.

In the absence of binding case law precedent from the United States Supreme Court or from the Eleventh Circuit Court of Appeals or from the former Fifth Circuit Court of Appeals [8] on the issue now before the Court, the Court is persuaded and holds that the correct rule of law to be here applied is that under new Rule 4, Fed.R.Civ.P., read in conjunction with Federal Rule 3, the filing of a Title VII complaint commences such civil action for 42 U.S.C. § 2000e–5(f)(1) statute of limitations purposes, but only provisionally, and if process upon the Title VII defendant is not served within 120 days of filing and good cause is not shown such Title VII case is time-barred if the 42 U.S.C. § 2000e(f)(1) statute of limitations has expired between the original commencement and the expiration date of the Rule 4, Fed.R.Civ.P., 120–day period. Moreover, the Court adheres to its observation contained in the March 20, 1986 Order entered in this case that the "facts" stated in the Affidavit of Attorney Michael J. Evans (first counsel of record for plaintiff) filed herein on March 14, 1986 in response to the Court's Rule 4(j), Fed.R.Civ.P., show cause order of March 6, 1986 did not constitute an adequate showing of good cause within the intendment of Rule 4(j) and the Court now squarely so holds. The result here is that the 90–day statute of limitations period prescribed by 42 U.S.C. § 2000e–5(f)(1) expired between the September 12, 1985 commencement date of this Title VII action by Dr. Pardazi against Cullman Medical Center and the January 11, 1986 expiration date herein of the 120–day period of Rule 4(j), Fed.R.Civ.P., which prescribes time limit for service of the summons and copy of the complaint. Plaintiff's original counsel of record was responsible for prompt service of the summons and copy of the complaint upon this Title VII defendant under the clear mandate of Rule 4(a), Fed.R.Civ.P. His failure to ful-

**8.** The Court notes its careful consideration of *Judkins v. Beech Aircraft Corp.,* 745 F.2d 1330 (11th Cir.1984); *Howard v. Lockheed-Georgia Co.,* 742 F.2d 612 (11th Cir.1984); *Suarez v. Little Havana Activities,* 721 F.2d 338 (11th Cir. 1983); *Caldwell v. Martin Marietta Corp.,* 632 F.2d 1184 (5th Cir., Unit B, 1980); *Shelley v. Bayou Metals,* 561 F.2d 1209 (5th Cir.1977); and

*Windbrooke Dev. Corp. v. Environmental Ent. Inc., Fla.,* 524 F.2d 461 (5th Cir.1975). With all due deference and disclaiming any effort or intention to disregard the case law precedent of this circuit or of its predecessor circuit, it is this Court's considered opinion that the issue now before the Court was not presented nor decided in cases above cited.

fill that duty for the 120–day period from and following the filing date of plaintiff's complaint in this case, coupled with plaintiff's failure thereafter to show good cause why such service was not made within that period, despite being given full opportunity by the Court so to do, caused the expiration of the 90–day statute of limitations period prescribed by 42 U.S.C. § 2000e–5(f)(1) although plaintiff commenced this action within such 90–day period by the filing of his Title VII complaint. The teaching of the United States Supreme Court in *Baldwin County Welcome Center v. Brown, supra,* is that Title VII civil actions are to be given no special status under the Federal Rules of Civil Procedure and that the procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by the courts out of a vague sympathy for particular litigants. 466 U.S. at p. 150 and p. 152, 104 S.Ct. at p. 1725 and p. 1726. In reaching the decision that Dr. Pardazi's Title VII is time-barred for the reasons above stated, the Court has considered and rejected plaintiff's argument that the doctrine of equitable tolling should apply because Cullman Medical Center has not demonstrated that it was prejudiced by plaintiff's failure to comply with the mandate of Rule 4(a), Fed.R.Civ.P., [plaintiff or his attorney "... shall be responsible for prompt service of the summons and a copy of the complaint."] This same argument was unsuccessfully made by the Title VII claimant in *Baldwin County Welcome Center v. Brown, supra.* Said the Supreme Court:

> This argument is unavailing. Although absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply once a factor that might justify such tolling is identified, it is not an independent basis for invoking the doctrine and sanctioning deviation from established procedures. 466 U.S. at 152, 104 S.Ct. at 1726.

An appropriate order granting defendant Cullman Medical Center's motion for summary judgment in its favor because the Title VII action of Dr. Pardazi is barred by the 42 U.S.C. § 2000e–5(f)(1) 90–day statute of limitations will be entered.